IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.,* BRENDA CARPENTER, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) CIVIL ACTION NO. 5:08-CV-287 (MTT) ) |
| S&K TECHNOLOGIES, INC., | ) ) ) |
| Defendant. | ) ) ) |

## ORDER

This matter is before the Court on cross motions for summary judgment filed by the parties in this case.  For the following reasons, the Relator's Motion for Summary Judgment (Doc. 40) is **DENIED** and the Defendant's Motion for Summary Judgment (Doc. 44) is **GRANTED**.

## I.    FACTUAL BACKGROUND

### A.    General Facts

In May 2004, Defendant S&K Technologies, Inc., a federally-chartered corporation organized by the Confederated Salish and Kootenai Tribes, was awarded contract FA8505-04-D-0010 for Technical Data Production, Printing and Distribution Services (the "contract").[1]  S&K operated, side-by-side with other government

---

[1]  It is unclear how the contract came about.  At some point prior to the contract, similar work was being performed under a similar contract by TAMSCO, an unrelated government contractor.  A company related to the Defendant, S&K Electronics, Inc., also performed similar services under a different contract, and this contract was novated to the Defendant in 2000.  Around that time, several employees of TAMSCO, such as Roy McBride and the Relator, were hired by the Defendant.

contractors and United States Air Force ("USAF") personnel, out of the 569th Aircraft

Sustainment Squadron at Robins Air Force Base ("Robins") in Warner Robins, Georgia.

Pursuant to the contract, S&K updated and maintained technical orders ("TOs" or

"technical manuals") and Time Compliance Technical Orders ("TCTOs") for F-15s sold

by the USAF's Foreign Military Sales ("FMS") program to the Royal Saudi Air Force (the

"RSAF" or the "Saudis") and to other countries.  TOs are essentially manuals that

provide instructions on how to maintain, inspect, or fly airplanes.  These manuals are

very large—often spanning multiple volumes.  TCTOs are step-by-step instructions on

how to modify or inspect aircraft.  The contract required S&K to maintain a quality-

control program that ensured that no less than 95 percent of the TO and TCTO pages

produced were error free.

S&K updates TOs and TCTOs based on information received from USAF

maintenance technicians and equipment specialists.  The recommended changes are

evaluated and, if approved, are assigned to various writers to draft.[2]  While drafting an

update, a writer has to determine whether a change is of such importance that it

requires a "change bar"—usually a mark in the margins of the changed TO page that

indicates that an important change has been made.  Rules regarding when to use

change bars and the format these are to take are found in the Department of Defense

Regulation, Mil-Std 38784, *Department of Defense Standard Practice for Manuals,*

---

[2]  There are two kinds of changes involved here:  a "change" and a "revision."  A change is "comprised of corrected pages to the basic manual.  It consists of information that improves or clarifies the basic manual without requiring rewriting or reorganization of the technical content of the basic manual"—in other words, a change usually involves simple edits that may include the addition or deletion of content or grammatical changes.  Pl.'s Ex. D, Mil-Std 38784.3.2.5.  A revision, on the other hand, is "a second or subsequent edition of a manual which normally supersedes the preceding edition"—in other words, a revision is an entirely new manual that replaces a prior one.  *Id.* at Mil-Std 38784.3.2.33.

*Technical:  General Style and Format Requirements* (the "military standards").[3]  The decision of whether to use change bars is often discretionary; the writer interprets the military standards and compares them to the altered text to determine if a change bar is necessary.  (McBride Dep. 17-19).  While only certain changes require change bars, all changes to a particular manual are reflected on the "A page," which is a list, placed in the front of the manual, that indicates which page was changed and when.  (Ussery Dep. 39:2-12; and Fairfield Dep. 13:15-17).

A written update then undergoes a technical and administrative quality check to ensure accuracy, proper use of change bars, proper page numbering, proper page layout, and proper notations on the A pages.  During the time when the Relator was employed by S&K, Roy McBride was responsible for ensuring that all manuals related to the RSAF were properly updated and were accurate.  Of particular importance, McBride would check the update for technical accuracy, including checking to make sure that change bars had been used properly.  When he was satisfied that the technical aspects were correct, he sent the update to the Relator or Brenda Cebada who checked the update for errors in grammar, page numbering, formatting, etc., which is known as an administrative check.

After the update passed all inspections, three digital copies stored on compact discs were sent to the Weapon Systems Logistics Officer stationed at the 569th Aircraft Sustainment Squadron's office in Dhahran, Saudi Arabia.  These CDs were delivered to the RSAF, which would print the updated manuals at its own facility.  In addition, S&K

---

[3]  Excerpts from the military standards are found at Pl.'s Ex. D, Pl.'s Ex. H, Pl.'s Ex. JJ, and Def.'s Ex. I.

delivered information-only hard copies of the update to the USAF or to other contractors for the USAF, such as Boeing or McDonnell Douglas.[4]

**B.     Facts Relating to the Non-Retaliation Claims.**

From when she was hired in June 2004 until her termination in May 2007, the Relator worked at S&K as Technical Data Production/Distribution Manager.[5]  In this position she was subordinate to McBride, but served as supervisor over, among others, Cebada.  Her job was to complete a final quality check of any updates to ensure that all of the data sent to the RSAF arrived timely and with a minimum of errors.

The events giving rise to this litigation began on April 6, 2007.  While performing a final check of two updated books, Cebada discovered four places where she believed change bars were needed.  Cebada returned the two books to the writers who had written the updates so they could rewrite the updates to include the change bars. These writers, Randall Turner and Renee Ussery, approached McBride for clarification because "they didn't understand why there would be a change bar required there." (McBride Dep. 134:5-8).  McBride determined that two of the supposed errors actually were errors, but that the other two supposed errors were not.  The changes were made and the books were distributed as usual.

McBride believed that this incident demonstrated that Cebada and the Relator did not understand the use of change bars under the military standards and that this lack of knowledge was holding up the distribution of the technical manuals.  McBride

---

[4]  This procedure has since been altered significantly.  Now, S&K uploads the updated manual to a printing database accessible by the RSAF, the USAF, and certain other contractors.  Those entities can then print the manual as needed.

[5]  Prior to being hired by S&K, the Relator had worked in a similar capacity for TAMSCO for ten years.

decided to address his concerns with the Relator and Cebada in early April 2007. However, the Relator was out of the office, and thus McBride met with Cebada only. McBride informed Cebada that she was no longer to check for change-bar errors because change bars were "technical;" instead, he would check and "would make decisions" about whether change bars were necessary.  (McBride Dep. 137:15-24). McBride subsequently gave the same instructions to the Relator.  The Relator sent McBride an email to confirm their conversation in which she said, "Per your instructions this morning, my understanding is that you consider Change Bars to be of a technical nature and we are only to check for grammatical errors."  (Carpenter Aff. ¶ 49).  At some point, the Relator asked to speak to George Kishigian, then the vice president of S&K, about the matter, but McBride refused her request.

Later, the Relator came to believe that McBride regarded change bars as unimportant and that he did not want anyone to check for errors in their use.  This concerned her because she believed that change-bar errors could produce a "safety of flight" risk.  She began to investigate the matter, asking friends of hers who were either USAF personnel or who had retired from the USAF "whether the change symbols were important enough to cause a safety of flight concern."[6]  (Carpenter Aff. ¶ 56).  Phrased in such a way, it is not surprising that the Relator's friends agreed that change-bar errors could create a safety of flight risk.  After nearly a month had passed since her instructions from McBride, the Relator decided to approach Willie Hargrove about her

---

[6]  These friends were Bill Sudderth, Jim West, James C. Roland and Edwin Lankowski. (Carpenter Aff. ¶ 56).

concerns.[7]  Hargrove was the Chief of Logistics for the 830th Aircraft Sustainment

Squadron and was the Security Assistance Program Manager appointed by Wright

Patterson Air Force Base for the Saudi program.[8]

The Relator told Hargrove that McBride had told her that she was no longer to

check for change-bar errors and that she had investigated and determined that change-

bar errors could cause safety-of-flight risks.  Hargrove directed the Relator to forward

him all emails and documents pertaining to the issue, which the Relator did.

As will be discussed below, less than a week after her meeting with Hargrove the

Relator was terminated for insubordination and failure to follow her chain of command.

It is undisputed that both S&K and senior USAF personnel were aware of the Relator's

meeting with Hargrove.

There are two things to note at this point regarding the evidence and the

Relator's allegations.  The first involves the investigation Hargrove ordered into the

alleged misuse of change bars by S&K.  The results of the investigation, released

months after the Relator's termination, are, as the Relator admits, not relevant to this

case.  This is because there is no way of knowing, or at least no evidence indicating

one way or another, if any of the TOs subject to the investigation were TOs that were

also subject to McBride's "new" policy.  Nevertheless, it is worth noting that while an

---

[7]  The Relator went to Hargrove along with Chrys Williams, an employee of CDO, another
government contractor, who had personnel issues to discuss.  According to the Relator, when
Williams tried to address personnel concerns, the Relator informed Williams and Hargrove that
she could not discuss personnel issues with them, but that she did have other concerns
(namely, the change-bar issues) to discuss.  (Carpenter Affidavit ¶ 60).

[8]  As will be discussed later, USAF personnel and S&K management had several issues to deal
with involving S&K employees.  One issue of particular concern to the USAF was the fact that
employees of various contractors would approach USAF personnel regarding human-resources
and quality-of-work-life concerns.  S&K issued strict orders to its employees that they were to
follow their chain of command and not to approach USAF employees regarding internal
personnel issues.

investigation into a random sampling of TOs did uncover a few instances where change bars might have been needed, McBride was able to explain to the satisfaction of the USAF why the change bars were not necessary in the places identified in the investigation.

Second, and this will be discussed at length later in this Order, the Relator has produced no evidence of any TOs produced after McBride gave his change-bar instructions to the Relator and Cebada.  The Relator acknowledged as much at oral argument.  The only evidence regarding any TOs produced by S&K is of the TOs at issue in the above-referenced USAF investigation and the two books in which Cebada found the four supposed errors.  There is no evidence of any other books and thus no evidence of any actual change-bar errors.  The Relator's contention seems to be that there could be TOs, produced after McBride's change-bar instruction but before his instruction was brought to the USAF's attention, that were distributed to the RSAF with changer-bar errors in them, and that, but for McBride's instructions, these hypothetical errors would have been caught by the Relator or Cebada had they been allowed to check for change-bar errors.

The Relator also asserts in her Complaint two other interrelated, non-retaliation False Claims Act claims.  It is important to note, however, for the purposes of the Relator's retaliation claim, that the Relator did not address the circumstances surrounding her other claims prior to her termination.  Therefore, to the extent that the Relator has a retaliation claim, these other two claims cannot form the basis of that retaliation claim.

The first claim concerns a process used by S&K known as "reissues."  The reissue process was developed in 1998, six years before S&K was awarded the current

contract, by USAF employee Steve Fairfield.  Fairfield created the reissue process because of the meticulousness of the Saudi customer.  In the process of printing an updated TO, if the RSAF discovered an error with the A page (the page that lists all pages of the TO and any changes to those pages), the RSAF would stop printing the book and notify the USAF or the contractor of the error.  (Fairfield Dep. 13:9-21). According to Fairfield, A-page errors are "not a problem, typically, in the US Air Force; [the USAF] go[es] ahead and print[s the TOs] and distribute[s] them and [the USAF] just recognize[s] there is a problem."  (*Id.* at 13:21-23).  However, the RSAF's refusal to print required a solution.

Fairfield suggested correcting the A-page error and sending out the manual with the newly-corrected A page as a "reissue."  The Saudis, having received copies of the TO with the corrected A page, would then print the latest-issued TO.  McBride, who worked for TAMSCO at the time, objected because he was concerned about configuration control; "If I go and reissue a book, now I have two changes, and if somewhere, like in the print plant, they have those two CDs, which one is the right one to use[?]"  (McBride Dep. 139:4-9).  Fairfield suggested adding the date of the reissue to the label in order to avoid confusion.  (*Id.* at 139:7-9; Fairfield Dep. 14:17-15:15).  This modification assuaged most of McBride's concerns and the reissue process was implemented.  S&K continued using the reissue process when it was awarded the contract.

The Relator argues that the reissue process constitutes a false claim (1) because S&K created it[9] to hide its error rate and (2) because the military standards do not provide for a reissue process—only a process for changes and revisions.

The other non-retaliation False Claims Act claim is related to the reissue claim. As a part of its production and distribution procedure, S&K is obligated to submit some TOs and TCTOs, depending on their content, to the Foreign Disclosure Office (the "FDO").[10] This is to ensure that all classified or otherwise-sensitive information has been approved for disclosure to foreign militaries. S&K usually would not send reissues to the FDO. The Relator alleges that this failure to seek FDO approval for reissues constitutes a false claim. S&K argues that it was unnecessary to send reissues to the FDO because the information had already been approved and the only new information in the reissue were the A page changes. In other words, all technical information had already received FDO approval.

## C.   Facts Relating to the Retaliation Claim

At Robins, S&K either shared office space with or worked in proximity to several other government contractors and USAF personnel. By most accounts, the work environment in this area of the base was one of discord. Extramarital affairs and petty squabbles had led to divisions and conflicts and the S&K hierarchy, particularly Roy McBride, was unable to do much to restore order.

---

[9]  The evidence is clear that S&K did not create the reissue process. Steve Fairfield, representing the USAF, created the reissue process.

[10]  The Plaintiff initially asserted a claim based on the failure of S&K to submit both reissues and TCTOs to the FDO. However, at a hearing on the matter, counsel for the Relator indicated that the reissue claim was solely concerned with the reissues and not the TCTOs.

The Relator was no stranger to the conflict within the office.  One reason for much of the discord and division was that she had learned, quite some time before her termination, that her son-in-law had engaged in an affair with her officemate (this is but one of the affairs that occurred at S&K).  This led to fractures and conflicts within the group of employees who shared that office space.  According to McBride and others, the employees in this area would often approach S&K executives about personnel problems and, when that did not resolve the issue, the aggrieved employee would approach senior USAF personnel.  Whether or not her concerns were addressed, the Relator took to drafting memoranda regarding her factious encounters with various people—presumably for use later at a disciplinary, or even legal, proceeding.[11]

The office discord at S&K and its effect on the quality of the technical manuals as well as the speed with which those manuals were produced concerned McBride.  Accordingly, he undertook several measures to address these issues.  He rearranged desks and furniture in the office in order to reduce socializing and conflicts.  He also had meetings and distributed memoranda regarding workplace behavior.  In particular, he

---

[11]  The Relator was not always as above the fray as she claims.  For instance, Renee Ussery described the following incidents that occurred involving the Relator.

    A      . . . . We had a get-together in the conference room; we all were in there.  We had a big table, food on the table, everybody lines up and goes down the line.  [Carpenter] proceeded to get right behind Renee Purty and intentionally shoved her; several witnesses to that . . . .

(Ussery Dep. 65:15-20).

    A      [Also, t]here was one day where [Carpenter] acted like she was going to—you know, like she tripped with a box at Ms. Purty.  There was another time Ms. Purty was sitting at the table, and Carpenter pulled her chair up there and just started [stared?] at her.  And it was getting to the point I couldn't work in there.
    Q      During all of this time what was Ms. Purty doing?
    A      Trying to ignore [Carpenter].

(*Id.* at 67:11-18).

stressed that employees must follow their chain of command when dealing with problems and that employees should not approach USAF personnel with their personal problems.  These measures were largely unsuccessful at improving the work environment.

It was in this context that the Relator approached Willie Hargrove.  Before she ever approached Hargrove, though, it is undisputed that the Relator did not utilize her chain of command.  After she spoke to McBride, she asked McBride for permission to speak with Kishigian and was denied.  She never approached Kishigian on her own, nor did she approach Melinda Taylor, the HR representative at S&K.  Instead, nearly a month after she approached McBride about the change-bar issues, she approached Hargrove.

On May 3, 2007, Chrys Williams, an employee of another government contractor, asked the Relator to accompany her to Hargrove's office.  According to the Relator, Williams did not tell her why she wanted to speak to Hargrove.  In Hargrove's office, Williams began to complain about personnel issues in the area where Williams worked with the Relator.  The Relator claims she dutifully interrupted Williams to inform her and Hargrove that she could not discuss such matters, but that she wanted to discuss the change-bar issue.  After briefly discussing the Relator's concerns, Hargrove requested that the Relator send her documentation regarding the issue and the meeting was concluded.  Through a series of emails following this meeting, the USAF informed S&K that it was displeased with the Relator's actions.  On May 9, 2007, S&K terminated the Relator's employment for failure to follow her chain of command and insubordination.

**D.     Procedural Facts**

The Relator filed this action on August 27, 2008.  Because this is an action under the False Claims Act, the government had the option of intervening in the case.  The Court granted a number of extensions to the government in order for the government to consider whether or not to intervene.  Finally, on December 3, 2009, the government notified the Court that it declined to intervene.  The Court then ordered service on S&K and the parties agreed to a discovery timeline.

After several months of discovery, the Relator filed her Motion for Summary Judgment on April 8, 2011.  Thereafter the Court extended the dispositive-motions deadline and allowed S&K to consolidate its response to the Relator's Motion with its own Motion for Summary Judgment, which S&K filed April 29.  A hearing was held on the fully-briefed motions on June 21.

**II.     DISCUSSION**

**A.     Summary Judgment Standard**

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Info Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  The district court must "view all evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in its favor."  *Id.*

**B.     Non-Retaliation Claims**

**1.     Background on the False Claims Act**

This is a case brought under the False Claims Act.

The FCA is a statutory scheme designed to discourage fraud against the federal government. . . .  Its roots lie in the rampant fraud perpetrated by contractors against the government during the Civil War, and it has served ever since as a safeguard against unscrupulous government contractors. . . .  The cornerstone provision of the FCA prohibits any person from presenting 'a false or fraudulent claim for payment or approval' to the United States. . . .

*Mann v. Heckler & Koch Defense, Inc.*, 630 F.3d 338, 342-43 (4th Cir. 2010) (citations omitted).  As a part of the statutory scheme of the False Claims Act, private parties, known as relators, are empowered to bring what are called *qui tam* actions in the name of the United States.  *Id.* at 343.  The government has the opportunity to intervene and take over the case; but if not, then the relator can pursue the case on behalf of the government and share in the recovery.  In addition, and as will be discussed later, the False Claims Act also provides whistleblowers with protection from retaliation by their employers.

Very generally speaking, a relator must prove three elements to state a claim under the False Claims Act:  "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false."  *United States, ex rel. Walker v. R&F Properties of Lake County, Inc.,* 433 F.3d 1349, 1355 (11th Cir. 2005).  However, as the Parties' briefs attest, False Claims Act legal analysis often involves much more than the simple application of a three-part test.  In this case, however, factual analysis, rather than legal analysis, is dispositive.  Although the facts are complex, when properly

examined, they reveal that as a matter of law Carpenter cannot prove that S&K violated the False Claims Act.

Although the facts primarily determine the outcome of this case, one legal principle merits note, even though the Court will not apply it in the resolution of the Relator's claims.  Many courts have added a materiality element to False Claims Act analysis and required that the false statement or claim be material to the government's funding decision.  *United States v. Bourseau*, 531 F.3d 1159, 1170-71 (9th Cir. 2008); *United States ex. rel A+ Homecare v. Medshares Mgmt. Group, Inc.,* 400 F.3d 428, 442 (6th Cir. 2005); *United States ex. rel Costner v. United States*, 317 F.3d 883, 887 (8th Cir. 2003); *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 689 (5th Cir. 2003); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006).

The Eleventh Circuit has not addressed whether district courts should evaluate the materiality of alleged false claims, although at least two district courts have suggested materiality is a necessary element of a claim.  See *United States ex rel. Stephens v. Tissue Sci. Lab., Inc.,* 2009 WL 3363727 (N.D. Ga. Aug.13, 2009); and *United States ex rel. Compton v. Circle B Enterprises, Inc.*, 2010 WL 942293 (M.D. Ga. March 11, 2010).  The Court can resolve the issues here without testing the materiality of the Relator's claims.  However, it will be evident from the Court's factual analysis of each of Carpenter's non-retaliation claims that a materiality requirement would be fatal to her claims.

## 2.    The Change-Bar Claim

The Relator alleges that she was told by McBride not to check TO updates for change-bar errors.  Worse, according to the Relator, McBride told her that he would no

longer ask writers to check for change-bar errors because they were not important.  The Relator's argument is that change bars are required by the military standards and these standards are incorporated into the contract, so refusing to check properly for change-bar errors and hiding this refusal from the government constitutes a false claim.  This claim, however, is without merit.

The only evidence of the Relator's version of McBride's change bar directive is found in her affidavit,[12] in which she alleges that McBride told her that "he was not going to go back and task [ask?] the writers to make corrections regarding Change Bars, because S&K was on a production schedule and it was not of high importance whether Change Bars were inserted properly or not."  (Carpenter Aff. ¶ 54).  McBride acknowledged that he told the Relator and Cebada not to check for change-bar issues.  According to McBride, however, change bars were technical in nature and the Relator and Cebada did not fully understand the military standards governing their use.  Moreover, the mistakes made by the Relator and Cebada in applying military standards were causing delays.  Because change bars were technical, and because his expertise was in technical matters, McBride said that he would continue to check for change-bar errors but that the Relator and Cebada should not.  McBride stated unequivocally that he never disregarded military standards regarding change bars.  (McBride Dep. 239:1-20).

The Relator's version of McBride's directive is contradicted by her own email documenting her conversation with McBride.  After their conversation, the Relator

---

[12]  Unfortunately, the Relator's affidavit provides the only testimony from the Relator because the trial strategy of the Defendant did not include taking the Relator's deposition.  The Court cannot help but think that the issues in this case could have been clarified greatly if the Relator had been cross-examined about her allegations.

emailed McBride:  "Per your instructions this morning, my understanding is that you consider Change Bars to be of a technical nature and we are only to check for grammatical errors."  (Carpenter Aff. ¶ 49).  This email confirms that McBride considered change bars to be technical and that he wanted the Relator and Cebada to focus on grammar.  More importantly, nowhere does it say anything to the effect that change bars were not important and were not to be checked by anyone.

Far from disregarding change bars, McBride had been checking and continued to check for errors in their use.  His testimony that he was checking for change-bar errors is not contradicted by anything in the evidence, other than the Relator's long-after-the-fact affidavit.  Even Cebada, the Relator's ally in S&K's office wars, testified in her affidavit that McBride told her that "Change Bars are a technical thing and that [he] should be the one to look for and require them."  (Cebada Aff. ¶ 12) (alteration in original).[13]

While there is evidence that Cebada found two change-bar errors *before* McBride's directive, these two errors were fixed and the books went out as usual.  This does not mean that McBride was not checking, or even that he was not checking properly.  In any event, the contract did not require 100% compliance, and the entire basis of the contract was updating manuals that had outdated or inaccurate information; if one or two change-bar errors slipped through the editing process, whether it was one stage only (i.e., only McBride checked) or it was two stages (i.e., McBride and then Carpenter or Cebada), this likely would not even constitute a breach of the contract,

---

[13]  Here again, S&K's trial strategy involved not deposing a crucial witness; this time Cebada, the Relator's "corroborating" witness.  In this critical instance, Cebada disputes the Relator's after-the-fact account of McBride's direction.  Still, it seems likely that the Court would have greatly benefited from a lively cross-examination of both the Relator and Cebada.

much less a false claim.  Moreover, it should be noted that even if there were change-bar errors, any changes to the technical manuals would still be reflected on the A page.

Finally, there is no evidence that McBride's alleged instruction to disregard change bars resulted in any change-bar errors—"false claims" as the Relator would call them.  Indeed, the Relator conceded as much at a hearing on these motions.  The Relator's counsel stated, "But again our case is not [that] a lot of change bar errors slipped through."  This is a strange assertion, because otherwise the Relator's claim becomes much more attenuated.  By necessity, her claim involves only books issued after McBride's instruction but before she approached the USAF through Hargrove; errors prior to McBride's instruction or after the USAF learned of the newly-implemented policy are not relevant to the claim.  Yet there is no evidence of any books that might have been affected by McBride's "new policy."  Instead, the Relator contends that there could have been books produced during this nearly-one-month window, that those books could have had change-bar errors, that those hypothetical errors slipped past McBride, and that those hypothetical errors could have been caught by the Relator and Cebada but for McBride's instructions to them not to check for change-bar errors.  There simply is no evidence to support this claim.

S&K is entitled to summary judgment on the Relator's change-bar claim.

### 3.      The Reissue Claim

The Relator's reissue claim must also fail.  The Relator argues that the reissue process is a false claim for three reasons.  First, the Relator argues that, "[a]s a part of its contractual duties, S&K is obligated to provide the USAF and other customers with a hard copy of any revisions it sends out to the Saudi customer."  (Carpenter Aff. ¶ 27).  The reissue process allowed S&K "to . . . ignore its contractual obligations to the USAF

entirely" by sending "[a] newly corrected revision . . . [on] CD . . . to the Saudi customer as usual," but not sending a hard copy "to the Air Force customer or to other legally authorized recipients as required by contract." (*Id.* at ¶ 31). If shirking its contractual obligations were not fraudulent enough, the Relator's second argument is that the reissue process was fraudulent because it "hid S&K's error rate from the USAF . . . [as] the USAF was not aware of the number of times a book might have to be 'fixed' after publication." (*Id.* at 30). "In a contract for the editing and distribution of technical manuals, the failure to deliver updated technical manuals could influence the Government's decision to pay S&K" and the lack of information on S&K's true error rate could affect the government's decision to renew a contract. (Rel.'s Reply/Resp. Br. 16). Finally, the Relator argues that the reissue process was fraudulent because the military standards do not explicitly allow such a process.

The Relator's first argument relies on S&K having a contractual obligation to send hard copies of whatever it produces pursuant to the contract to the USAF and/or other USAF contractors, such as Boeing and McDonnell Douglas. However, outside of the Relator's base assertion in her affidavit, there is no evidence suggesting that such a contractual obligation exists. The Court has examined the excerpts of the military standards and the contract provided by the parties and can find no such requirement. Moreover, the Relator has not shown that she has sufficient personal knowledge of S&K's contractual obligations to qualify her to testify on such matters. Even in her affidavit, she does not point to any specific provision in either the contract or the military

standards that evinces such a requirement.[14]  While S&K does not deny that it sent information-only hard copies to the USAF or other contractors, this does not mean that it did so because of a contractual obligation.

Moreover, the weight of the evidence tends to show that such a contractual requirement did not exist, or if it did, that it was insignificant.  First, the reissue process was not cooked up in some back room at S&K; it was developed by Steve Fairfield, a representative of the USAF, in 1998—six years before S&K got the contract.  (Fairfield Dep. 13:9-15:12 and 42:7-8).  Second, the errors corrected by the reissues were almost exclusively "A page" errors—that is, errors, not involving technical information, but the front material that simply catalogued what changes had been made.  (Fairfield Dep. 16:18-22 and 28:7-10; and McBride Dep. 140:5-9).  Although the USAF would print the manual even if there were A-page errors, the Saudis refused to print such manuals. (Fairfield Dep. 13:9-14:1; McBride Dep. 143:24-144:8).  This "work around" was motivated by the Saudi customer's meticulousness, not by any attempt to deceive the USAF about S&K's error rate.  (Fairfield Dep. 13:9-14:1; McBride Dep. 143:24-144:8). Third, the hard copies sent to the USAF and other contractors were strictly informational only.  (McBride Dep. 60:19-24 and 140:5-9).  These manuals were not used for maintenance, operations, or training.  (*Id.* at 60:25-61:3).  Taken together, this evidence

---

[14]  It is important to note that the Court is not ruling that there is no such contractual requirement.  The Court's ruling is that there is no credible evidence on the matter.  Vague allegations of such an obligation, without more, are insufficient to create an issue of material fact on summary judgment, even construing the facts in favor of the Relator.

indicates, among other things, that there was no contractual obligation for S&K to send information-only hard copies of revisions to the USAF.[15]

The Relator's second argument is that the reissue process was fraudulent because it allowed S&K to deceive the USAF about its error rate, thus affecting the USAF's decisions to pay S&K and to renew its contractual relationship with S&K. However, there is no evidence of such a motive on the part of S&K—quite the contrary, in fact. As shown above, the undisputed evidence is that the reissue process was developed by Steve Fairfield, a representative of the USAF. Additionally, there is no evidence that the USAF used the information-only hard copies provided by S&K to evaluate whether or not to pay S&K, or whether or not to renew its contractual relationship with S&K.

The Relator's final argument is that the reissue process itself is fraudulent because it is not authorized in either the military standards or in the contract. Again, the Relator makes conclusory allegations without any evidence to support them. The Relator has provided no evidence that the contract or military standards forbid reissues, or that such reissues were in violation of the contract or military standards. For instance, if the Relator had desired to make such a case, the Relator would have had to have produced evidence from the contract or military standards themselves, or from contracting parties for S&K or the USAF, or from an expert on military standards. The Relator instead relies on her own affidavit testimony, as well as general references to the military standards and to excerpts from the contract, to suggest that reissues were

---

[15]  Another point worth considering is that even if such a contractual provision could be proven to exist, it was such an insignificant provision that failure to comply with it could not possibly violate the 95-percent-compliance requirement.

forbidden.  This is insufficient to support her claim that the reissue process violated the contract or military standards, much less that the process constitutes a fraudulent claim.

It is doubtful that, if proven, any of the Relator's above allegations would constitute a false claim, either on their own or collectively.  However, the Court need not address the legal significance of the Relator's theories because they are not supported by any credible evidence.  Therefore, S&K is entitled to summary judgment on the Relator's reissue claim.

**4.     The Foreign Disclosure Office Claim**

Finally, Relator has failed to produce any evidence to support her claim that S&K defrauded the government by failing to clear reissues with the FDO before sending them to the RSAF.  In her Complaint, the Relator did not limit her FDO claim to reissues; however, the Relator acknowledged at oral argument that her FDO claim was now limited to reissues.  Specifically, the Relator alleges that "S&K contracted to ensure that FDO approval was sought whenever proper, and as to reissues, S&K never sent a single one through the FDO . . . ."  (Rel.'s Resp./Reply Br. 14).  However, the Relator has not produced any evidence that there were reissues that should have gone through the FDO but did not.  Instead, the Relator relies on McBride's statement that "99 and 9/10ths percent of the reissues were A-page errors" and Cebada's claim that she has no knowledge of sending TCTOs through the FDO to suggest that perhaps there was at least some information in the reissues that was possibly of a technical nature that should have gone through the FDO but did not.

This argument fails for two reasons.  First, Steve Fairfield, who designed the reissue process, stated that there was no technical information in the reissues.  At his deposition, Fairfield was asked:  "There is nothing new, or no new systems, or new

weapon systems, or technology that was in the reissue that required somebody to make sure we could be cleared?"  (Fairfield Dep. 16:18-16:20).  To which he responded, "Absolutely not.  It's not considered a reissue if there were any technical data changes." (16:21-16:22).  Moreover, assuming that Fairfield was wrong and that there was a non-A-page, technical correction in the reissue, and further assuming that S&K never sent any reissues to the FDO, the Relator has produced no evidence that this presumed technical information was the kind of information that had to go through the FDO.[16]

However, S&K has presented evidence that reissues did not meet the requirements for FDO disclosure.  McBride testified that S&K's decision to disclose to the FDO was discretionary, made according to the "DDL," a document used by the FDO to determine what information needed to be approved before being sent to foreign clients, which "spell[ed] out for [S&K] what is releasable and what is not releasable to a foreign government . . . ."  (McBride Dep. 104:6-8).  In other words, according to the undisputed evidence, S&K made the decision whether to send information through the FDO on a case-by-case basis in accordance with standards set out in the DDL. Moreover, the undisputed facts show that the USAF Office of Special Investigations ("OSI") conducted an investigation into, among other areas, the submission of materials by S&K to the FDO.  (Def.'s SOF ¶ 46).  In that investigation, there was only one

---

[16]  The only evidence the Relator presents regarding the FDO is found in the untested-by-cross-examination affidavit of Brenda Cebada.  In it, Cebada states that she was responsible for the "transmission of Interim, Urgent and Safety Time Compliance Technical Orders ("TCTO["]s)" and that, from October 2001 to December 2007, Cebada had no "knowledge of any messages [she] transmitted . . . being forwarded to Foreign Disclosure for approval prior to distribution to the Saudi customer."  (Cebada Aff. ¶ 23).  This tells the Court very little about whether S&K sent TCTOs through the FDO, and absolutely nothing about whether S&K sent reissues or any other information through the FDO.  To the extent that this evidence indicates anything about the treatment of TCTOs, the evidence is similar to that regarding the reissues in that it does not indicate whether this information was the kind of information that should have gone through the FDO.

instance when the OSI found that S&K failed to submit information to the FDO when required.  (*Id.* at ¶ 47).  However, in that one instance, the information in that document did not contain unauthorized data so the OSI determined that the issue was moot.  (*Id.*).

The Relator has failed to produce any evidence that S&K defrauded the government by failing to submit information to the FDO.  Therefore, S&K is entitled to summary judgment on the FDO claim.

**C.    The Retaliation Claim**

The Relator has also alleged that she was fired in retaliation for her whistleblowing activity.  As noted above, the Relator's retaliation claim can only be based on the change-bar allegations, not on the reissue or FDO allegations.  The Relator only addressed change-bar issues in her communication with Fairfield.  She did not make her allegations regarding reissues or the FDO until well after she had been terminated.  Therefore, those allegations have no relevance to the retaliation issue.

The False Claims Act, in 31 U.S.C. § 3730(h),[17] provides protection for

> [a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section….

The Relator does not claim to have direct evidence that her termination was an act of retaliation for her protected activity.  Rather, like most victims of alleged job discrimination and retaliation, she relies on circumstantial evidence, and the framework

---

[17]  Section 3730(h) was amended in 2009.  However, the amended version of section 3730(h) does not apply to this case because the amended version, which took effect on May 20, 2009, applies only to conduct on or after May 20, 2009.  Here, the alleged retaliatory conduct occurred in 2007.

for analyzing circumstantial evidence first applied in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to make her case.  To establish a prima facie case of retaliation, a plaintiff must prove that (1) the employer is covered by the act at issue, (2) the employee engaged in protected activity, (3) the employee suffered adverse action, and (4) there is an inference of causation between the protected activity and the adverse action.  *Mann v. Olsten Certified Healthcare Corp.*, 49 F.Supp.2d 1307, 1317 (M.D. Ala. 1999) (citing *Bechtel Const. Co. v. Secretary of Labor*, 50 F.3d 926, 934 (11th Cir. 1995)).[18]

A prima facie case of retaliation raises a presumption that the employer is liable to the employee, and the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, non-retaliatory reason for the employment action.  *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  The burden then returns to the plaintiff to prove that the employer's reasons are pretextual.  *Id.* at 253.  The employee can meet this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (emphasis added).   If the proffered reason is one that might have motivated a reasonable employer, the

---

[18] Other courts articulate a two-part test, while yet others articulate a three-part test.  *Mack v. Augusta-Richmond County, Georgia*, 365 F. Supp. 2d 1362, 1378 (S.D. Ga. 2005) ("[A] plaintiff must show that (1) he engaged in protected conduct and (2) that the defendant retaliated against him because of that conduct."); *Robinson v. Jewish Center Towers, Inc.*, 993 F. Supp. 1475, 1477 (M.D. Fla. 1998) ("[T]he plaintiff must show that she engaged (1) in conduct protected under the False Claims Act; (2) defendant was aware of the plaintiff's actions; and (3) plaintiff was terminated in retaliation for her conduct.").  Comparing the two and three part tests, Judge Bowen in *Mack* wrote, the "third element of knowledge on the part of the defendant is subsumed into the element of causation for a defendant cannot retaliate or discriminate against a plaintiff because of his whistleblowing activities if the defendant is unaware of such activity."  365 F. Supp. 2d at 1378.  Substantively, each version of the test gets to the same place.  Because the parties used the *Mann* four-part test, the Court uses it here.

employee "must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).

S&K does not contest, nor could it, elements (1) and (3) of the prima facie case: S&K received federal funds as a U.S. government contractor, thereby subjecting it to coverage under the False Claims Act, and the Relator was fired.  Moreover, (4) is easily proved.  "The showing necessary to demonstrate the causal-link part of the prima-facie case is not onerous." *Mann*, 49 F.Supp.2d at 1317.  The Relator "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).  "The [relator] must at least establish that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff." *Id.* Additionally, the Supreme Court requires a causal link based on mere temporal proximity to be "very close" and approvingly cited circuit decisions holding three-and four-month periods insufficient to establish a causal connection.  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).  The Eleventh Circuit has recognized that a seven-week temporal proximity between acts could establish a causal connection.  *Nicholas v. Bd. of Trustees of Univ. of Ala.*, 251 Fed. Appx. 637, 644 (11th Cir. 2007).  Here, it is undisputed that S&K was aware that the Relator had contacted Fairfield about her change-bar concerns.  Additionally, the Relator was terminated less than a week after her meeting with Fairfield.  Thus, the only issue here is whether the Relator engaged in protected activity.

"Protected activity encompasses measures taken 'in furtherance of an action . . . filed or *to be filed* under this section.'" *Mann v. Heckler & Koch Defense, Inc.*, 630 F.3d

338, 343 (4th Cir. 2010) (emphasis in original).  An employee need not actually file a False Claims Act claim to recover for retaliation; however, protected activity must involve "'situations in which litigation could be filed legitimately,'" not situations in which "'an employee . . . fabricates a tale of fraud to extract concessions from the employer, or . . . just imagines fraud but lacks proof." *Id.* at 344.  In other words, "§3730(h) only protect[s] an employee from retaliation when there [is] at least 'a distinct possibility' of litigation under the False Claims Act at the time of the employee's actions."  *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303 (11th Cir. 2010).  This means that the allegedly fraudulent conduct "reasonably could lead to a **viable** FCA action . . . ." *Heckler & Koch*, 630 F.3d at 344 (emphasis added).

Here, there was no "distinct possibility" of litigation because S&K's conduct could not lead to a viable False Claims Act action; again, McBride only told the Relator (who confirmed McBride's instructions in an email) that change bars were technical in nature and that she needed to focus only on grammatical issues.  McBride was still responsible for checking the accuracy of the use of change bars by the writers and the Relator had no evidence at the time, nor has she produced any since, to indicate that McBride abandoned this responsibility.  Even if he did abandon his responsibility, however, it is unlikely that failure to check for change-bar errors could be said to be in any way fraudulent for the purposes of the False Claims Act.  First, the A page still contained all of the changes made in any given publication so the end user of the technical manual would still be alerted to the fact that a change had occurred in the manual.  Moreover, protected activity must concern the employee's investigation into "more than his employer's non-compliance with federal or state regulations."  *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 187-88 (3d Cir. 2001).  Change bars are governed by

military standards, which are essentially formatting regulations; this means that the Relator's investigation of S&K's alleged failure to comply with military standards is not the kind of investigation that constitutes protected activity.

Even if the Relator could establish a prima facie case of retaliation, S&K has advanced a legitimate non-retaliatory reason for the Relator's termination—her violation of S&K's requirement that she raise any concerns properly through the chain of command.  Admittedly, this reason for the Relator's discharge is a bit tricky because it can be characterized as firing the Relator for blowing the whistle on S&K's misconduct. However, under the facts of this case, the Relator's unauthorized communication with Hargrove provided a legitimate basis for discipline.  As discussed above, personnel issues, personal issues, and petty squabbles, which the Relator participated in, had caused considerable troubles for S&K and the USAF.  The USAF had made clear its unhappiness with the state of affairs.  Indeed, not only S&K, but USAF contracting personnel were also unhappy when the Relator breached the chain of command to speak with Hargrove.  In view of these facts, S&K has demonstrated a nondiscriminatory reason to discipline the Relator.

S&K having articulated a legitimate, non-retaliatory reason, the burden shifts to the Relator to show that the reason is merely pretext.  The analysis of this issue, though, follows the same evidence and same arguments as for the issue of S&K's legitimate, non-retaliatory reason.  Again, the Relator was terminated because she failed to follow her chain of command, not for the content of her communication with Hargrove.  The Relator has no evidence that there was some retaliatory reason that motivated S&K because there was nothing to retaliate against her for—her change-bar concerns were trivial, while the disruptions in the office, to which the Relator was a great

contributor, were significant.  Moreover, she cannot show that S&K's explanation is not worthy of credence because she never followed her chain of command.  Meanwhile, S&K has proven that it was having severe personnel issues; that the Relator was one of the main instigators of the problems S&K was dealing with; that S&K had implemented measures to address the personnel problems; that one of those measures was requiring S&K personnel to use the chain of command to address any concerns; and that the Relator disregarded the chain of command.  For the Court to rule that such a well-supported reason is pretext would essentially require the Court to rule that the whistleblower protections of the False Claims Act attach to any communication of an employee of a government contractor with the government.

However, once more giving the Relator the benefit of every doubt, assuming that she can prove pretext, the successful navigation of the *McDonnell Douglas* test does not necessarily guarantee that a plaintiff can survive summary judgment.  In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), the Supreme Court held that there are "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."  *Id.* at 148.  "For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, *or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.*"  *Id.*  In this event, judgment as a matter of law for the defendant is appropriate.  *Chapman*, 229 F.3d at 1025 n.11.  This is precisely the situation here (or would be, at least, if the Relator could prove her prima facie case).

Assuming that the evidence the Relator presented was sufficient to prove both her prima facie case and that S&K's legitimate, non-retaliatory reason was merely pretext, her case is so weak, and there is abundant and uncontroverted evidence that no retaliation occurred, that no rational factfinder could conclude that her termination was retaliatory.

While this should terminate the inquiry, the Court would be remiss if it did not address an argument that the Relator made several times, both in its briefs and at oral argument, regarding a previous holding of this Court.  The Relator has argued, based on this Court's ruling in *Parato v. Unadilla Health Care Center, Inc., et al*., 2011 WL 1196067 (M.D. Ga. March 28, 2011), that regardless of whether the change-bar concerns she addressed to Hargrove were baseless, she is still entitled either to summary judgment or to proceed to a jury on her retaliation claim.  In *Parato*, the employer claimed that it fired the relator, not in retaliation for raising claims of possible fraud, but rather because those claims were baseless.  This Court granted the employer's motion for summary judgment on the relator's fraud allegations, but nevertheless denied summary judgment on the relator's retaliation claim, reasoning that "[i]f an employer could avoid FCA whistleblower liability by simply declaring that it fired an employee because her claims of fraud were baseless, the protection the FCA seeks to provide whistleblowers would be gutted."  *Parato*, 2011 WL 1196067, at *12.  The Relator relies on this language to argue, in essence, that any communication concerning the performance of a government contract by an employee of a government contractor with the government, no matter how baseless, is entitled to protection.

However, there are two significant distinctions between the situation here and that in *Parato*.  First, Parato's claims for fraud were not so baseless that the employer

could assume that there was no possibility of a False Claims Act action.  As discussed above, the Relator's complaint about McBride's "new" change-bar review procedures did not raise a distinct possibility of litigation under the False Claims Act.  Second, Parato was fired directly because she raised claims of fraud.  Here, S&K fired the Relator because she breached the chain of command.  Given the environment in the contracting offices at Robins, it is reasonable that S&K and the USAF clamped down on employees ignoring the chain of command.

In light of the above, the Relator cannot prove her prima facie case and S&K is entitled to summary judgment on the retaliation claim.

## III.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Defendant's Motion for Summary Judgment (Doc. 44) and **DENIES** the Relator's Motion for Summary Judgment (Doc. 40).

**SO ORDERED**, this the 19th day of August, 2011.


S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT


jch